FAIR, J., for the Court:
¶ 1. In February 2009, Southern AgCre-dit filed a complaint in the Stone County Circuit Court against David Fleisher, seeking judgments on four loans that were in default. Following discovery, both parties moved for summary judgment. The trial court granted partial summary judgment to Southern AgCredit. The court found that Fleisher had personally guaranteed the loans, but a fact question still existed as to the amounts owed under the loans. Fleisher’s motion was denied.
¶ 2. In June 2010, a bench trial was held on the issue of whether the value of the properties was sufficient to satisfy the loans held by Southern AgCredit. The trial court found it was not, and Fleisher owed Southern AgCredit a deficiency of $351,300.75 on three of the four loans. The court did not make a ruling on the fourth loan because it was in bankruptcy and under the protection of the automatic stay.
¶ 3. Fleisher now appeals, asserting Southern AgCredit did not meet its burden of proof to establish a deficiency judgment. Southern AgCredit cross-appeals, contending that the trial court erred in not holding Fleisher personally liable for the entire amount of the fourth loan. We affirm on Fleisher’s direct appeal. How *950 ever, we find Southern AgCredit’s cross-appeal meritorious, so we remand the case to the circuit court for a determination of the amount due under the final guaranty.
FACTS
¶ 4. After Hurricane Katrina struck the Mississippi Gulf Coast in 2005, Fleisher, William M. Adkinson, Lee F. Kennedy, and Robert T. Windham sought to purchase and develop certain tracts of land in the devastated areas. The four men formed a total of twenty-one limited liability companies and named them Mississippi Investors I-XXI. The lawsuit filed by Southern AgCredit that is the issue of this appeal involved four of these LLCs-Mis-sissippi Investors VII, VIII, X, and XIV (MS VII, MS VIII, MS X, and MS XIV). Each investor owned different Florida companies, and each Florida company was a member of the four LLCs.
¶ 5. In 2006, Southern AgCredit issued loans to MS VII, VIII, X, and XIV. The loans were secured by deeds of trust on the land that was purchased. Fleisher, Adkinson, Kennedy, and Windham each signed personal guaranties on the loans. The guaranties stated that each individual was liable for 140% of his 25% ownership interest in the LLCs. Sometime after the loans were closed, Fleisher and Kennedy sold their interests in the four LLCs to Adkinson. However, they were still bound by their personal guaranties on the loans.
¶ 6. Between June and September 2006, Southern AgCredit obtained appraisals for each of the properties. Michael Elliot (Michael), a Mississippi certified general real estate appraiser, performed the appraisals. Michael was an employee of and senior appraiser for Southern AgCredit. Joe Mallard assisted with the appraisals. Mallard was a registered forester and loan officer at Southern AgCredit. Mallard performed timber cruises for each of the properties and prepared a detailed evaluation of the value of the timber. The timber value was included as part of the appraised value of each property. A second appraisal was performed by Michael in March 2008. Mallard did not participate in this appraisal. The revised appraisals did not include any value for timber.
¶7. By August 2008, all of the loans were in default. Southern AgCredit filed suit in the Stone County Circuit Court against Fleisher, Adkinson, Kennedy, and Windham seeking to recover on the loans pursuant to the personal guaranties. Southern AgCredit also sought to recover attorney’s fees and costs in the amount of $80,448.92.
¶ 8. The four LLCs eventually filed for bankruptcy. MS VII, X, and XIV failed to make adequate protection payments on the loans. The bankruptcy court lifted the automatic stay on these three properties, which allowed Southern AgCredit to start foreclosure proceedings. The automatic stay on MS VIII was not lifted because a plan of reorganization had been proposed. In January 2010, a foreclosure auction was held to sell the properties securing the loans for MS VII, X, and XIV. Southern AgCredit was the sole bidder and purchased each piece of property.
¶ 9. Fleisher does not dispute that he is liable under the personal guaranties. Fle-isher’s argument is that he owes nothing to Southern AgCredit because the fair market value of the properties exceeded the amounts owed on the loans when the properties were sold. The trial court disagreed with Fleisher and awarded Southern AgCredit a deficiency judgment. The trial court found the deficiencies on the loans were as follows: MS VII-$299,068; MS X-$326,766.25; and MS XIV-$377,882.17. According to his personal guaranty, Fleisher was responsible for 140% of his 25% share in each of the LLCs. Thus, the amounts *951 owed by Fleisher were determined to be as follows: MS VII-$104,673.80; MS X-$114,368.19; and MS XIV-$132,258.76. The total judgment against Fleisher was $351,300.75. In making these calculations, the trial court took into account the discrepancies between the 2006 and 2008 appraisals. Also, Fleisher was ordered to pay court costs and post-judgment interest of 8% per annum.
¶ 10. In addition to the award given by the trial court, Southern AgCredit sought the full balance of the MS VIII loan because no foreclosure sale had taken place. The balance on this loan was $3,150,000. The trial court found that any judgment regarding MS VIII would be premature because a reorganization plan was pending in the bankruptcy court.
STANDARD OF REVIEW
¶ 11. An appellate court affords a circuit court judge sitting without a jury the same deference as a chancellor. City of Jackson v. Perry, 764 So.2d 373, 376 (¶ 9) (Miss.2000). That is, after reviewing the entire record, we will affirm if the judge’s findings of fact are supported by substantial, credible evidence and are not manifestly wrong or clearly erroneous. Id. Errors of law are reviewed de novo. Id.
DISCUSSION
1. On Direct Appeal by Fleisher
¶ 12. Fleisher argues he owes no deficiencies on the loans because Southern AgCredit failed to prove the foreclosure sales were just and equitable.
¶ 13. To be entitled to a deficiency judgment, Southern AgCredit bore the burden of proving that it had “endeavored to collect the indebtedness out of the land.” Hartman v. McInnis, 996 So.2d 704, 711 (¶ 22) (Miss.2007) (citing Lake Hillsdale Estates, Inc. v. Galloway, 473 So.2d 461, 466 (Miss.1985)). An additional burden is imposed because Southern AgCredit was the mortgagee and purchased the property at the foreclosure sale. “Where the foreclosing creditor buys at foreclosure, it must give the debtor fair credit for the commercially reasonable value of the collateral.” Id. at (¶ 23) (citation omitted). “To determine the adequacy of the purchase price in satisfying the debt, the mortgagee must establish the fair market value of the property.” Id. (citation omitted). The fair market value is to be determined by the trier of fact, and the appellate court will respect the trial court’s findings when they are supported by reasonable evidence in the record and are not manifestly wrong. Id.
¶ 14. The only issue at trial was whether a deficiency was owed on the loans. Two witnesses testified: Benjamin Elliot for Southern AgCredit and Adkin-son for Fleisher. Elliott was a licensed real estate appraiser and the chief operations and risk management officer for Southern AgCredit. Elliott was not involved in making the loans, but he was responsible for servicing them. The most recent appraisals were done in 2008. The 2008 appraisals concluded that MS VII had a fair market value of $5,954,600; MS X had a fair market value of $1,334,600; and MS XIV had a fair market value of $2,204,600.
¶ 15. Elliott testified that the value of the properties had not changed from 2008 to 2010. He based this on reports and market information relied on by Southern AgCredit and his opinion that the overall market values in the area had not changed. Although timber cruises were performed in 2006, the 2008 appraisals do not reflect any timber values. As to MS VII and X, Elliott testified that no separate timber appraisal was done in 2008 because a significant amount of timber had been cut and *952 the remaining timber was either not mature or undesirable. As to MS XIV, Elliott did not know whether the timber had been cut since 2006, but he believed the land was more for recreational use than for timber production. Elliott testified the deficiency after the foreclosure sale was $2,349,836.42. In determining this amount, Elliott subtracted the foreclosure price from the total amount owed on the loans. At the time of trial, all three properties were for sale. The properties were listed for more than was paid at the foreclosure auction. Southern AgCredit’s attempt to sell the properties included putting up “for sale” signs. Limited inquiries and no offers had been received.
¶ 16. Adkinson was a land developer and had worked in the real estate and construction business for forty-five years. Adkinson testified the LLCs had taken steps to begin developing the properties, such as making down payments, paying interest, having utilities installed, installing roads, obtaining permits, and paying engineering fees. He testified the LLCs spent $33,000,000 above the loan amounts on these efforts. Adkinson believed the properties were worth two to five times the values given by Southern AgCredit. He based this on his own opinion, the amounts he and other investors had invested in the initial phases of development, the lack of timber values in the 2008 appraisals, and the sale price of a portion of the property. The sale Adkinson referenced was 6.28 acres purchased by Mississippi Power Company in 2007 for over $10,000 an acre. Also, Adkinson referred to appraisals he obtained in 2008, but these appraisals were not submitted at trial. Adkinson testified these appraisals valued the land higher than Adkinson estimated at trial. He testified his numbers were “extremely conservative” in comparison to the appraisals. As to the timber, Adkinson testified that in 2007, timber was cut on 270 to 300 acres of MS VII. Approximately 1,200 acres on MS VII were untouched, and no timber was removed from MS X and XIV. In determining the value the timber added to the land, Adkinson testified he used figures provided by Mississippi State University’s website, which he had found through Southern AgCredit’s website. He did not consider the timber value from MS X. He testified that MS X was the highest valued property not because of its timber, but because it had unique characteristics, such as a clear-water creek and large oak trees.
¶ 17. The trial court found the price paid at auction was reasonable. However, the trial court expressed concern that the bids did not include any timber values. In determining the deficiencies owed by Fle-isher, the trial court factored in the timber values. In 2006, the timber on MS VII, X, and XIV was valued at $1,233,200, and the land was valued at $6,304,365. The market value given in the 2006 appraisal was $7,537,500. The 2008 appraisal states that the land value was $5,954,600. The market value in this appraisal was also $5,954,600. Both appraisals state the timber is seven to eight years old. No explanation is given as to why the timber did not age between 2006 and 2008. The 2008 appraisal states that the timber had been “thinned,” but it does not state how much timber had been thinned or why no timber value was calculated. In 2006, 689 acres of pine were given an appraised per-acre price; the remaining timber was given a price per ton. Adkinson testified approximately 300 acres were cleared between 2006 and the time of trial. He testified the timber that was cleared was the lower valued timber. However, no other evidence was presented to support this motion. In the 2006 appraisal, the seven-year-old pine was valued at $300 per acre and the five-year-old pine was valued at $200 per acre. The trial court found that *953 Southern AgCredit had been paid two principal payments of $23,095.89 and $37,600 for the sale of timber on MS VII, which had not been taken into consideration. The trial court gave Fleisher a credit for these amounts. After taking the age and amount of remaining timber into consideration, as well as the extra payments toward principal, the trial court determined the timber value was $1,172,504.11. The trial court then calculated the timber value of MS VII, X, and XIV based on the number of acres of timber remaining on each piece of property. This value was then added to the market value of each piece of property as stated in the 2008 appraisals.
¶ 18. The trial court noted that while the price paid at foreclosure was lower than the appraised values plus the timber values, it was not so low as to shock the conscience under the standard set by the Mississippi Supreme Court. The court has held that “absent any irregularity in the conduct of a foreclosure sale, it may not be set aside unless the sales price is so inadequate as to shock the conscience of the Court ‘or to amount to fraud.’ ” Allied Steel Corp. v. Cooper, 607 So.2d 113, 118 (Miss.1992) (quoting Wansley v. First Nat’l Bank of Vicksburg, 566 So.2d 1218, 1224 (Miss.1990)). In order to shock the conscience, the bid price must be so inadequate that “it would be ‘impossible to state it to a man of common sense without producing an exclamation at the inequality of it.’ ” Id. (quoting Cent. Fin. Servs., Inc. v. Spears, 425 So.2d 403, 405 (Miss.1983)). “The threshold of inadequacy, or what it takes to shock the conscience of the court, has been a somewhat imprecise standard. [The Mississippi Supreme Court has] long followed the rule of thumb of ‘about forty percent’ of fair market value first articulated in Weyburn v. Watkins, 90 Miss. 728, 733-36, 44 So. 145, 145-146 (1907).” Allied Steel, 607 So.2d at 120. A foreclosure sale bid of thirty-six percent of fair market value has been found inadequate. Id.
¶ 19. As to MS VII, the trial court found the fair market value to be $7,127,104.11, and Southern AgCredit bid $4,925,591.67 at foreclosure. The price paid for MS VII was 69% of fair market value. As to MS X, the trial court found the fair market value to be $1,442,075, and Southern AgCredit bid $1,118,824.66 at foreclosure. The price paid for MS X was 98% of fair market value. As to MS XIV, the trial court found the fair market value to be $2,247,600, and Southern AgCredit bid $2,204,600 at foreclosure. The price paid was also 98% of fair market value. These bid prices are not so low as to shock the conscience, and Fleisher alleges no irregularity in the conduct of the foreclosure sale.
¶ 20. Following the standard of review, this Court “will respect the trial court’s findings of fact when they are supported by reasonable evidence in the record and are not manifestly wrong.” Hartman, 996 So.2d at 711 (citations omitted). The record lacked evidence of current timber values. However, the trial court used the evidence available to estimate the fair market value of the property with the timber values. We find that the trial court’s findings are supported by reasonable evidence and not manifestly wrong. Thus, the trial court’s findings regarding the sale price at foreclosure and the deficiency owed by Fleisher are affirmed.
2. On Cross-Appeal by Southern AgCredit
¶ 21. The trial court found it would be premature to award Southern AgCredit a judgment against Fleisher for MS VIII because bankruptcy proceedings were pending. Southern AgCredit argues it is entitled to the deficiency on this loan *954 regardless of the bankruptcy proceedings because of Fleisher’s personal guaranty.
¶ 22. The personal guaranty states: “it ■will not be necessary for Creditor, in order to enforce such payment by Guarantor, first to ... enforce its rights against any security that shall ever have been given to secure the Guaranteed Indebtedness.” Also, provision 6(d) of the agreement states: “Guarantor agrees that [his] obligations under the terms of this guaranty will not be released, diminished, impaired, reduced, or affected by ... bankruptcy.” However, the trial court found that an inequitable result may be reached if Southern AgCredit was allowed to collect from Fleisher before the plan of reorganization is complete. The trial court held:
If that plan is adopted or some modification of that plan is adopted whereby the note continues in force and effect with payments being made thereon, there would be no amounts due and owing by Fleisher as a guarantor. If a judgment were to be entered here in favor of Southern AgCredit and either the Bankruptcy Court approved some reinstatement of the loan or the Bankruptcy Court lifted the stay to allow foreclosure on the subject property, Fleisher would still have a valid and enforceable judgment against him for the full amount claimed by Southern AgCredit even though monies would be being received by Southern AgCredit from either a foreclosure or continuation of payments on the loan by Mississippi Investors VIII. This would be patently inequitable. Further, should there be a foreclosure at a later date, the same analysis concerning fair market value, foreclosure amounts and such would need to be made on the facts and evidence as then may exist.
¶ 23. The MS VIII guaranty establishes that Fleisher is obligated for 35% (140% of his 25% interest) of the unpaid balance due on the MSVIII note. We conclude that Southern AgCredit is entitled to a judgment in that amount now and not later.
¶ 24. The terms of Fleisher’s agreement unquestionably establish that it is a guaranty of payment and not a conditional guaranty. The agreement provides that it is not necessary for Southern AgCredit to “enforce its rights against any security” before proceeding against Fleisher. That is, Southern AgCredit need not foreclose on the property before seeking a monetary judgment.
¶ 25. The situation here is analogous to the one the Mississippi Supreme Court examined in Rea v. O’Bannon, 171 Miss. 824, 832, 158 So. 916, 918 (1935), when it held:
There is no inconsistency in the two remedies here available to [the secured creditor]. He could pursue the foreclosure to conclusion, or, if he deemed it advantageous to himself, he could forego the foreclosure and proceed at law to collect his debt in the law forum.... There is no inconsistency between the legal and equitable remedial rights possessed by a mortgagee in case of a breach, and he may exercise them all at the same time, and resort to one is not a waiver of the other.
¶ 26. This observation has been reaffirmed by our courts in more recent years. See W. Point Corp. v. New N. Miss. Fed. Sav. & Loan Ass’n, 506 So.2d 241, 243 (Miss.1986); Knight Props., Inc. v. State Bank & Trust Co., 77 So.3d 491, 494-95 (¶ 15) (Miss.Ct.App.2011). A similar provision exists in the Uniform Commercial Code, as adopted into Mississippi law. See Miss.Code Ann. § 75-9-601 (Supp.2011) (“After default, a secured party ... [m]ay reduce a claim to judgment, foreclose, or otherwise enforce the claim ... by any available judicial procedure.”). Like the *955 lender in Rea, Southern AgCredit would ordinarily have the option of foreclosing on the property that secures its loan to MS VIII.
¶27. Southern AgCredit cannot foreclose on the MS VIII property because MS VIII is in bankruptcy and is protected by the automatic stay. Nevertheless, Fle-isher guaranteed MS VIII’s loan against default, and MS VIII has defaulted. His guaranty specifically states that bankruptcy of MS VIII is no bar to recovery.
¶ 28. It must be remembered that Fle-isher himself has not filed for bankruptcy. Nor is he, as a codebtor, shielded by the automatic stay that protects MS VIII. In McCartney v. Integra National Bank, 106 F.3d 506 (1997), the Third Circuit Court of Appeals surveyed the law with respect to codebtors like Fleisher. It held as follows:
Although the scope of the automatic stay is broad, the clear language of [11 U.S.C. § 362(a) (1996) ] stays actions only against a “debtor.” [Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir.1991)] (citing Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp., 682 F.2d 446, 448 (3d Cir.1982)). As a consequence, “[i]t is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the ... debtor.” Id. at 1205 (quoting Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196-97 (6th Cir.1983)); see also United States v. Dos Cabezas Corp., 995 F.2d 1486, 1491-93 (9th Cir.1993) (holding that stay does not preclude government from pursuing deficiency judgment against nondebtor cosignors of promissory note); Croyden Assocs. v. Alleco, Inc., 969 F.2d 675, 677 (8th Cir.1992) (refusing to extend stay to claims against solvent codefendants); Credit Alliance Corp. v. Williams, 851 F.2d 119, 121-22 (4th Cir.1988) (enforcing a default judgment entered against a nondebtor guarantor of a note during the pendency of the corporate obligor’s bankruptcy).
Id. at 509-510 (some citations omitted).
¶ 29. A circuit court does not have the authority, legal or equitable, to deny Southern AgCredit a judgment enforcing its constitutionally protected contractual rights. Nor may the court deny Southern AgCredit the right to utilize all legal means to collect it.
¶ 30. Speculation about what a federal bankruptcy court will do in the future with the MS VIII property is not sufficient reason to deny Southern AgCredit’s contractual rights to a judgment. Likewise, speculation about what Southern AgCredit may do in the future to collect its judgment from Fleisher would be equally inappropriate. It might elect to collect, in whole or in part, from other non-exempt assets. And it may do so in lieu of, or prior to, resort to the real estate currently entangled in bankruptcy proceedings.
¶ 31. In any case, recovery by Southern AgCredit from any source must be properly credited toward a judgment in its favor. Procedures for doing so are well established, including crediting the proceeds of foreclosure on the property now in bankruptcy in the same manner deficiencies were decided on the other notes, should foreclosure ultimately occur.
¶ 32. “[A] primary rationale for refusing to extend the automatic stay to nonbankrupt third parties is to insure that creditors obtain the protection they sought and received when they required a third party to guaranty the debt.” McCartney, 106 F.3d at 510 (internal quotation omitted).
*956 ¶ 38. This case is remanded to the trial court for a determination of the amount due under the MS VIII guaranty and for entry of a final judgment in that amount in favor of Southern AgCredit.
¶ 84. THE JUDGMENT OF THE STONE COUNTY CIRCUIT COURT IS AFFIRMED ON DIRECT APPEAL AND REVERSED AND REMANDED ON CROSS-APPEAL FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE SPLIT EQUALLY BETWEEN THE APPELLANT/CROSS-APPELLEE AND APPELLEE/CROSS-APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ, CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. BARNES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.